# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

JERRI J. HUGHES,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C04-0165

**REPORT AND RECOMMENDATION**

————————————

    This matter comes before the court pursuant to briefs on the merits of this application for disability insurance benefits (docket number 3). This matter was referred to the undersigned United States Magistrate Judge for the issuance of a report and recommendation (docket number 13). It is recommended that the court find in favor of the plaintiff and that this matter be remanded for an award of benefits.

## I. PROCEDURAL BACKGROUND

    Plaintiff Jerri J. Hughes applied for Title II Social Security benefits on October 23, 2001, alleging an inability to work since September 6, 1999, due to degenerative disk disease, chronic neck, shoulder, and upper extremity pain, residuals from anterior cervical diskectomy and fusion, and history of acid reflux disease. Her application was originally denied and denied again on reconsideration. A hearing before Administrative Law Judge (ALJ) Jesse H. Butler was held February 18, 2004. In an opinion dated April 23, 2004, the ALJ denied benefits. On October 7, 2004, the Appeals Council denied the plaintiff's

request for review. This action for judicial review was timely filed on December 1, 2004.[1]

## II. FACTUAL BACKGROUND

The plaintiff was born June 2, 1955. (Tr. 50). She has a high school education. (Tr. 78). She is married and lives with her husband and child. (Tr. 338). She has previously worked as a waitress and head waitress. (Tr. 131).

The plaintiff arrived at St. Luke's Hospital in Cedar Rapids, Iowa, by ambulance on March 20, 1998, after being involved in a car accident. (Tr. 136). She was seen by Dr. Linder. (Tr. 142). She complained of neck pain. (Tr. 137). She was then seen by Dr. Michael Lawrence for a follow-up examination concerning her shoulder and neck pain on March 24, 1998. (Tr. 141). Dr. Lawrence noted:

> [The plaintiff] comes in now with generally improved symptomology except for having developed some pain in her neck and a little stiffness. She has good movement.. . . She sits up without discomfort.

(Tr. 142). For her pain, the plaintiff was prescribed medications and was directed to use hot compresses. (Tr. 143). The plaintiff was seen on July 14, 1998, complaining of neck and back pain. (Tr. 147, 250). Dr. Todd Butler examined the plaintiff and noted her reported symptoms as follows:

> [The plaintiff] is here because of back pain. . . . She was in a car accident apparently in March 1998. . . . She says, since then, she has had pain in her back. She says she has burning between her shoulder blades and her neck bilaterally. She has been taking Tylenol without much relief. She says when she picks up things around the house it makes it worse.

(Tr. 250). At Dr. Butler's direction, the plaintiff had x-rays taken of her cervical spine on July 14, 1998. (Tr. 262). Dr. Richard Kundel recorded the results of the x-rays,

---

[1] The plaintiff's original Complaint was filed December 1, 2004 (docket number 2). An amended Complaint was filed December 3, 2004 (docket number 3).

noting that they revealed "[d]egenerative type changes in the lower cervical spine." (Tr. 262).

The plaintiff was seen by Dr. Butler on July 29, 1998. (Tr. 249). She reported that her back pain had been "going on and off since March, 1998." (Tr. 249). Dr. Butler recorded the plaintiff's reported symptoms, in relevant part, as follows:

> [The plaintiff] says that she is not having really more symptoms. She just has continued pain. It really doesn't radiate anywhere. She has it just in her upper back. She has no weakness in her arms, no sensory changes, and also no similar changes in her lower extremities. . . . She has been taking Ibuprofen, she says, faithfully and has not made a great difference in her pain. She has continued to work through this.

(Tr. 249).

Physical therapist Carol Schueller completed a physical therapy intake evaluation concerning the plaintiff on August 4, 1998. (Tr. 322). The plaintiff reported the following symptoms, as noted by Ms. Schueller:

> [The plaintiff] notes pain across the back and upper back. She experiences burning after lifting, vacuuming, sweeping, scrubbing, all affects it. It spreads to both sides of her neck and burning into her upper back.

(Tr. 322). The plaintiff rated her pain as a 7 on a 10 point scale, and noted that it had been worse over the past two weeks and at its best was a 5 on a 10 point scale. (Tr. 322).

The plaintiff attended physical therapy on August 6, 1998. (Tr. 320). She reported to Ms. Schueller that she had just finished doing "all the things that make her more painful." (Tr. 320). She indicated that driving bothered her, "especially with turning around." (Tr. 320). The plaintiff reported having felt better "lower down" in her back after her first treatment, but that she then felt a burning, "almost a tingling," in her upper back. (Tr. 320).

Ms. Schueller saw the plaintiff for a physical therapy appointment on August 13, 1998. (Tr. 318). The plaintiff stated that she was "a little bit better" and a little "looser

in the neck." (Tr. 318). She was still experiencing "tightness in the upper back." (Tr. 318). The plaintiff attended physical therapy on August 11, 1998. (Tr. 319). She reported to Ms. Schueller that she was "pretty much the same" and that the area in her back near her shoulder blades was "feeling better." (Tr. 319). She further reported that while she was completing her stretching exercises, she noticed pain at the sides of her neck and in her back "a little." (Tr. 319).

The plaintiff again attended physical therapy on August 18, 1998. (Tr. 317). She reported to Ms. Schueller that she had "up and down times over the weekend since she helped her daughter lift her bike into the Blazer." (Tr. 317). The plaintiff further reported experiencing "pain and tightness" since lifting the bike, and that the pain and tightness were "across both shoulders and into the neck, left side more than the right." (Tr. 317). Ms. Schueller saw the plaintiff for a physical therapy appointment on August 20, 1998. (Tr. 315). The plaintiff indicated that the day prior she felt sore in her left arm, neck and mid back. (Tr. 315). She wasn't sure "why the pain was worse, not sure if it was from sleeping on another bed or what when she was in Des Moines." (Tr. 315). The plaintiff reported that Advil and a heating pad "seemed to help a little bit." (Tr. 315). The plaintiff attended physical therapy on August 25, 1998, following an appointment with Dr. Pape. (Tr. 314). She reported that she was "feeling pretty good" and that she had been feeling so since her last therapy appointment. (Tr. 314). She rated her pain as a 2 on a 10 point scale. (Tr. 314). Ms. Schueller completed a physical therapy daily note concerning the plaintiff on August 27, 1998. (Tr. 313). The plaintiff reported that she was "having a good day." (Tr. 313). She further reported that it was "a little tight in the back of the neck, and a little bit of burning in the neck area." (Tr. 313). Ms. Schueller recorded that the plaintiff was "improving" and "did not feel she needed us today." (Tr. 313). The plaintiff was placed on a "hold" status for therapy and was told to call if therapy was needed. (Tr. 313).

Dr. LaMorgese completed a physician's report on January 4, 1999. (Tr. 208). In his report, Dr. LaMorgese opined that the plaintiff should return to half days of work "until seen," that she should be restricted to lifting, pulling, or pushing no more than 20 pounds, and that she should be restricted from reaching above the shoulder, bending, climbing, crawling, grasping, kneeling, pulling, pushing, and reaching. (Tr. 208).

The plaintiff was seen by Dr. LaMorgese on August 3, 1999. (Tr. 204). Dr. LaMorgese noted that the plaintiff did "have restricted motion in the neck and it was painful on head rotation, extension, and forward flexion." (Tr. 204). Valium was prescribed in an effort to control the plaintiff's pain. (Tr. 204). On August 17, 1999, the plaintiff was seen by Dr. LaMorgese following an MRI scan. (Tr. 204). Dr. LaMorgese described the results of the MRI as follows:

> The [MRI] scan shows a large central and right sided disk herniation at the C6-7 level with compression of the cord. I recommend an anterior cervical diskectomy and fusion. The [plaintiff] does have a small central disc protrusion . . . and has some mild to moderate degenerative changes.

(Tr. 204).

Dr. Todd Butler completed a preoperative consultation form concerning the plaintiff on September 9, 1999. (Tr. 170). Dr. Butler noted that the plaintiff had recently been seen by Dr. LaMorgese for an MRI, which indicated "moderate-to-large sized central disc herniation to the right at the C7 level, also some mild-to-moderate degenerative changes at C5-C6 and also small central disc bulging at the C7-T1 level." (Tr. 170).

On September 13, 1999, the plaintiff underwent disc surgery in her cervical spine. (Tr. 152, 171). Dr. LaMorgese performed the surgery and completed an operative report on September 13, 1999. (Tr. 188). He noted that the plaintiff had presented with "severe neck pain . . . to both shoulders, shoulder blades and upper back, left greater than right." (Tr. 188). Dr. LaMorgese recorded that the plaintiff underwent "anterior cervical diskectomy and fusion at the C6-7 . . . without difficulty. There was rupture of the

posterior longitudinal ligament with herniated disc material predominately centrally." (Tr. 188). The plaintiff was discharged on September 14, 1999.

Dr. LaMorgese saw the plaintiff on October 5, 1999. (Tr. 201). He noted that the plaintiff seemed to be "getting along very well," and indicated that he would "probably release her for light duty work" in three to four weeks time. (Tr. 201). On October 26, 1999, Dr. LaMorgese recorded that the plaintiff was doing "reasonably well with her neck surgery," but that she did have "at times, some burning discomfort at the base of her neck and shoulder areas." (Tr. 201). On November 23, 1999, Dr. LaMorgese noted that the plaintiff was "still having some pain the neck, over into the shoulder areas. She is improved somewhat in that she is having less headaches and overall is doing better, but certainly is not cured at this point in time." (Tr. 201). Dr. LaMorgese noted that he was going to "hold [the plaintiff] off work for this point in time," although he anticipated that she "may be able to go back to work in mid-January." (Tr. 201). Dr. LaMorgese opined that physical therapy would probably "not [be] real helpful at this juncture." (Tr. 201).

The plaintiff was seen by Dr. LaMorgese for a re-check on January 4, 2000. (Tr. 198). Dr. LaMorgese's notes included the following:

> The [plaintiff] is doing fairly well. She does have some restrictions of motion in the neck, especially with head turning to the left, and I would feel that this is fairly marked. She also is having some pain in the neck itself . . .[she] does have some pain that goes into the shoulder blade areas. . . . I am allowing her to return back to light duty work, starting January 10th, ½ days for two weeks. She is restricted to do no kneeling, climbing, stooping, or crawling. She has a 20 pound weight lifting restriction.

The plaintiff was again seen by Dr. LaMorgese on February 1, 2000. (Tr. 198). His notes indicated:

> [The plaintiff] continues to have pain with head turning, especially to the left. She even has some pain in the trapezius area on the left that extends to the shoulder region. She has pain between the shoulder blades. Work activities have been held to a minimum. She states that this month she has only

worked about 16 hours in total. She has been doing some light work around the restaurant, but not waitress work. I indicated that she could do half days this month as a waitress with a 20 pound weight lifting restriction. I will see her again in one month and obtain a lateral x-ray of her neck at that time.

(Tr. 198). Dr. LaMorgese prescribed pain medication for the plaintiff. (Tr. 198).

On February 29, 2000, Dr. LaMorgese saw the plaintiff for another re-check. (Tr. 198). His notes included:

[The plaintiff] is doing light duty work, 4 hours a day, and has not returned back to waitress type work. Activities in general seem to flare her up and she is taking pain medication . . . and she also uses some Advil. The [plaintiff's] lateral x-ray shows incorporation of her graft. . . . I am letting her go back to work 6 hours a day right now with the same restrictions as she had before, which was 20 pound weight lifting restriction and not to work with her arms above shoulder height.

On April 4, 2000, the plaintiff was seen by Dr. LaMorgese for a re-check. (Tr. 197). She reported that she still had "pain in [her] neck and shoulders after she has worked about six hours or so." (Tr. 197). She also reported needing pain medication on some days. (Tr. 197). Dr. LaMorgese opined as to the plaintiff's residual functional capacity as follows:

I feel that [the plaintiff] does have a lifting restriction of approximately 15 to 20 pounds on a permanent basis. I feel that she has reached maximum medical healing and do not anticipate any further improvement. . . . I have determined that this [plaintiff] has a 14% medical impairment and I do not expect any fundamental improvement in the future. Because of her limitations of head rotation she has a 4% impairment; as a result of her limitation of side bending she has a 4% impairment; forward flexion represents a 4% impairment; and extension represents a 2% impairment. . . . I believe the [plaintiff] will have to limit her activities based on pain and previous physical limitations that I placed on her.

Dr. Chad Abernathey completed a neurosurgical record on July 26, 2000. (Tr. 214). In his record, Dr. Abernathey opined as to his impressions of the plaintiff's condition as follows:

7

> [The plaintiff] clinically presents with chronic cervical strain
> following a [motor vehicle accident] and subsequent surgery.
> I do not recommend an aggressive neurosurgical stance due to
> a paucity of clinical and radiographic findings. . . . [S]he was
> advised to come to my office for pain medications due to
> Dr. LaMorgese's retirement.

Dr. James Justice saw the plaintiff on October 16, 2000. (Tr. 245). Dr. Justice indicated that the plaintiff had been sent to him by Dr. Abernathey for the purpose of prescribing Lortab. (Tr. 245).

Dr. Justice saw the plaintiff on October 16, 2001, for the plaintiff's annual examination. (Tr. 243). Dr. Justice noted that the plaintiff was "not having any specific problems." (Tr. 243). Dr. Justice's recorded his review of the plaintiff's systems as follows:

> I was unable to get anything positive out of [the plaintiff].
> When I asked her if there was any part of her body that wasn't
> working right for her she said, 'No.' Her arms do bother her
> a little bit if she tries to work above her head.

(Tr. 243).

Dr. AnnaMaria Guidos completed a social security disability evaluation concerning the plaintiff on December 20, 2001. (Tr. 217). Dr. Guidos noted the plaintiff's reported symptoms as follows:

> The [plaintiff] states she was in her usual state of health until
> a motor vehicle accident . . . [following which] [h]er neck was
> stiff and sore. It got worse. She had physical therapy at Work
> Well Clinic and helped for a little while. She was on anti-
> inflammatories. She still had pain and discomfort. . . . She
> had surgery . . . [i]t got better to the point where she became
> more functional, but she still has stiffness and discomfort about
> her neck and upper back. Still has some radiation of pain into
> her left greater than right upper extremity. Her greatest
> difficulty is a decreased range of motion and restrictions in
> terms of lifting, bending and reaching.

(Tr. 217). Dr. Guidos opined as to the plaintiff's limitations and restrictions, in relevant part, as follows:

> I would maintain the present restrictions she has. The
> [plaintiff] will be limited to no lifting, pushing, or pulling
> greater than 15 pounds. No reaching, stretching, or reaching
> above her shoulders. No crawling. Ambulation with no
> specific restrictions. No stooping, climbing, kneeling, or
> crawling would be recommended. Standing no specific
> restrictions. Walking with no specific restrictions. Moving
> about with no specific restrictions. On sitting, no specific
> restrictions in an 8-hour day. Handling objects, as noted
> above, with the restrictions. Sitting with no specific
> restrictions. Hearing and speaking and traveling, no specific
> restrictions other than what was already mentioned. Work
> environment should be relatively free of dust, fumes, extreme
> temperatures and hazards.

(Tr. 219).

Dr. J.D. Wilson completed a review concerning the plaintiff's limitations for
Disability Determination Services on January 28, 2002, based on a review of her records
and an examination of the plaintiff. (Tr. 230). Dr. Wilson opined as to the plaintiff's
symptoms, limitations, and credibility as follows:

> The [plaintiff's] pain report is generally consistent with what
> she has reported to treating and examining sources. She reports
> pain in her neck and shoulders made worse with activity, cold
> weather and lifting. She sometimes gets headaches. She takes
> Celebrex, Lortabs, and Tylenol. She is limited in making
> beds, changing sheets, vacuuming, sitting in bleachers and
> riding in the car. She reports no problem walking however
> she states that she can only sit for short periods of time. The
> [plaintiff's] allegations are largely credible. She does have an
> impairment which could reasonably cause pain in her neck and
> shoulder and which could be exacerbated by much lifting.
> There does not appear to be a medical reason to support sitting
> restrictions. The limitations outlined are generally consistent
> with her allegations and are consistent with treating source
> opinion.

(Tr. 230).

Dr. Guidos completed a second social security disability evaluation concerning the
plaintiff on July 17, 2002. (Tr. 231). Dr. Guidos' opinions were based upon her

examination of the plaintiff and a review of her records. (Tr. 232). The plaintiff reported increasing problems with neck tightness and "getting more tired with activity." (Tr. 232). Dr. Guidos made the following evaluation concerning the plaintiff's limitations:

> [The plaintiff] states that she has difficulty sitting at a desk and looking down and would need to change positions every 30 minutes or so. The restriction should be limited with no lifting, pushing/pulling greater than 15 [pounds]. No reaching, stretching, or reaching above the shoulders. No crawling. Ambulation; no specific restrictions. No stooping, climbing, kneeling, or crawling would be recommended. Standing: no specific limitations. Walking: no specific limitations. Moving about: no specific limitations. Sitting: it would be recommended that she gets to change positions in an 8-hour day but no specific restrictions. [Plaintiff] should be free to get up and move about. In an 8-hour day, sitting itself would not be restricted, but she should have the opportunity to move about every 30-60 minutes as need be on a prn basis. Handling objects as noted above. Would probably recommend avoiding repetitive type activities such as painting or doing repetitive type of activities with her bilateral upper extremities.

(Tr. 233).

Dr. Justice saw the plaintiff on October 17, 2002. (Tr. 242). Dr. Justice's impression and plan concerning the plaintiff was, in relevant part, as follows:

> Osteoarthritis pains cervical secondary to MVA in 1998. We will send her over the to the Pain Clinic to see if they can help us out with managing the pain and get better results. Obviously, if they can do something to diminish the pain without using pills, I would be really happy and so would she. If there's really nothing they can do to help out, we will try the Ultracet. If that doesn't work, I would try Disalcid. If that doesn't work, I would try to find something else other than Lortab that won't make her sick to her stomach, but will control the pain.

(Tr. 242). Dr. Tork Harman saw the plaintiff for a consultation on October 25, 2002. (Tr. 280). Dr. Harman recorded the plaintiff's reported symptoms as follows:

> The [plaintiff] reports that she has had pain continuously since the time of the [motor vehicle] accident. She has pain located

> in the base of her neck. It radiates up towards her skull,
> radiates towards both shoulders, and intermittently down her
> arms. Intensity comes and goes. She describes a burning
> sharp pain. The intensity of the pain ranges from 3 to 9.
> Every day is different. The more active she is using her arms
> and neck, the worse the pain is. The more inactive she is, the
> better she feels.

(Tr. 280). Dr. Harman discussed with the plaintiff the possibility of adjusting her medications to try to alleviate some of her pain. (Tr. 281).

On November 27, 2002, Dr. Harman completed an operative report concerning the plaintiff. (Tr. 268). Dr. Harman noted:

> The [plaintiff] returns today with continued complaints of pain
> in her neck, shoulder, and arms as well as headache. She was
> seen a month ago . . . [s]he started Vioxx 25 mg daily and felt
> like her headaches improved but her neck and shoulder pain
> did not improve. . . . She is noting that she is not sleeping
> well because the pain awakens her at night. The pain does
> range anywhere from a 4 to a 9. It is improved with rest, heat
> or massage. Repetitive arm movements seem to make it
> worse.

(Tr. 268). Dr. Harman administered an epidural injection into the plaintiff's spine for her pain. (Tr. 269-69).

Dr. Harman completed an operative report concerning the plaintiff on December 19, 2002 concerning his administering trigger point injections in an attempt to relieve the plaintiff's pain. (Tr. 293). He noted that the plaintiff had reported some mild improvement following the epidural injection he administered on November 27, 2002. (Tr. 293). Dr. Harman's impression was that the plaintiff had degenerative disease of the cervical spine "status post anterior cervical diskectomy and fusion," and he noted that the plaintiff also reported pain "consistent with myofascial component." (Tr. 294). Dr. Harman noted, "I will try trigger point injections today to see which route gives her better relief." (Tr. 294).

The plaintiff was again seen by Dr. Harman on July 3, 2003. (Tr. 305). He described the plaintiff's reported symptoms, in relevant part, as follows:

> She has been on Vioxx and amitriptyline . . . [s]he sleeps
> better with this combination. She still has aching pain in her
> neck and shoulders, left can be worse than right, or vice versa
> on a given day. She gets some achiness and vague tingling in
> her upper extremities . . . [c]old weather and repetitive activity
> make the pain worse. Warm heat and rest improves her
> symptoms.

(Tr. 305). Dr. Harman administered trigger point injections. (Tr. 305).

Dr. Harman wrote a letter to the Social Security Administration Office of Hearings and Appeals concerning the plaintiff on February 17, 2004. (Tr. 331). Dr. Harman noted that he began treating the plaintiff in October, 2002, and that "[a]t that time, she demonstrated chronic neck, shoulder and upper extremity pain which I found consistent with her previous disk herniation and surgical experience." (Tr. 331). Dr. Harman summarized the plaintiff's treatments, under his care, as follows:

> In November of 2002, we performed cervical epidural steroid
> injection treatments. From November of 2002 through
> January of 2004, I have tried to provide a series of pain relief
> remedies, including trigger point injections, and medical trials
> for pain relief. [The plaintiff's] neck pain, shoulder pain, and
> upper extremity pain are consistent and sometimes coupled
> with headaches. [The plaintiff] has described that her
> symptoms are disabling and affect her sleep habits and physical
> activity.

(Tr. 331). Dr. Harman went on to opine as to the plaintiff's credibility as follows:

> Through my treatment of [the plaintiff], I find her complaints
> to be credible. I find this course of treatment consistent with
> a person who has encountered medical problems following an
> automobile accident in March 1998, neck surgery in
> September of 1999, and now residual pain from degenerative
> disk disease.

(Tr. 331).

### III. CONCLUSIONS OF LAW

#### A. Scope of Review

In order for the court to affirm the Administrative Law Judge's (ALJ) findings of fact, those findings must be supported by substantial evidence appearing in the record as a whole. See Lochner v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989). Substantial evidence is more than a mere scintilla. It means relevant evidence a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1997); Cruse, 867 F.2d at 1184; Taylor v. Bowen, 805 F.2d 329, 331 (8th Cir. 1986). The court must take into account evidence which fairly detracts from the ALJ's findings. Cruse, 867 F.2d at 1184; Hall v. Bowen, 830 F.2d 906, 911 (8th Cir. 1987). Substantial evidence requires "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Cruse, 867 F.2d at 1184 (quoting Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966)). The court must consider the weight of the evidence appearing in the record and apply a balancing test to contradictory evidence. Gunnels v. Bowen, 867 F.2d 1121, 1124 (8th Cir. 1989); Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987).

#### B. ALJ's Determination of Disability

Determining whether a claimant is disabled is evaluated by a five-step process. See 20 C.F.R. § 404.1520(a)-(f); Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

> The five steps are:
> (1)     If the claimant is engaged in substantial gainful activity, disability benefits are denied.
> (2)     If the claimant is not engaged in substantial gainful activity, her medical condition is evaluated to determine whether her impairment, or combination of impairments, is medically severe. If the impairment is not severe, benefits are denied.

（3）    If the impairment is severe, it is compared with the listed impairments the Secretary acknowledges as precluding substantial gainful activity.    If the impairment is equivalent to one of the listed impairments, the claimant is disabled.

（4）    If there is no conclusive determination of severe impairment, then the Secretary determines whether the claimant is prevented from performing the work she performed in the past.    If the claimant is able to perform her previous work, she is not disabled.

（5）    If the claimant cannot do her previous work, the Secretary must determine whether she is able to perform other work in the national economy given her age, education, and work experience.

Trenary v. Bowen, 898 F.2d 1361, 1364 n.3 (8th Cir. 1990) (citing Bowen v. Yuckert, 482 U.S. at 140-42); 20 C.F.R. § 404.1520(a)-(f).

"To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." Frankl v. Shalala, 47 F.3d 935, 937 (8th Cir. 1995) (citing Reed v. Sullivan, 988 F.2d 812, 815 (8th Cir. 1993)).  If the claimant meets this burden, the burden of proof then shifts to the Commissioner to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education and work experience.  Id.

Under the first step of the analysis, the ALJ determined that the plaintiff had not engaged in substantial gainful employment since September 6, 1999.  At the second step, the ALJ determined the plaintiff had the following impairments: neck and back pain status post cervical fusion surgery; and a history of acid reflux disease.  At the third step, the ALJ determined that the plaintiff's impairments were not equivalent to one of the listed impairments.  At the fourth step, the ALJ determined the plaintiff had the following residual functional capacity (RFC):

can lift no more than 15 pounds occasionally and less than 10 pounds frequently; can sit up to six hours of an eight hour

work day; can stand and walk six hours out of an eight hour work day; can no more than occasionally balance, stoop, crouch, kneel, crawl or climb; cannot do frequent reaching or do work overhead; and can work at no more than a regular pace.

The ALJ determined that the plaintiff is unable to perform her past relevant work as a waitress or head waitress[2]; however, based on this RFC, the ALJ determined that the plaintiff could perform other work in the national economy, such as food checker, check cashier, and gambling cashier. The ALJ further found that "even if the [plaintiff] were limited to sedentary work, which the record does not show . . . jobs still exist in significant numbers in the national economy that she can perform."

## C. Subjective Allegations of Pain

The plaintiff first argues the ALJ improperly rejected her subjective complaints of pain. When evaluating the credibility of a claimant's subjective complaints, the ALJ may not disregard them "solely because the objective medical evidence does not fully support them." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). "The [ALJ] is not free to accept or reject the claimant's subjective complaints solely on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." Id. In evaluating claimant's subjective impairment, the following factors are considered: (1) the applicant's daily activities; (2) the duration, frequency and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Id. at 1321-22. Subjective

---

[2] The court notes that the ALJ's finding in this regard is unclear. In the body of his opinion, the ALJ states that based on the vocational expert's testimony in response to his RFC questioning, the plaintiff "can perform her past relevant work," and that she "has not shown the inability to perform her past relevant work." However, in his findings, the ALJ states that the plaintiff "is unable to perform her past relevant work as waitress or head waitress."

complaints may be discounted if inconsistencies exist in the evidence as a whole. Hinchey v. Shalala, 29 F.3d 428, 432 (8th Cir. 1994); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

The ALJ discredited the plaintiff's subjective allegations of pain for several reasons. Specifically, the ALJ found that the plaintiff's daily living activities[3], her work activity during the period of alleged disability,[4] evidence in the record that medication helped to alleviate some of her symptoms,[5] and inconsistent reports of symptoms,[6] undermined the

---

[3] The ALJ pointed to the following daily living activities as being inconsistent with an allegation of total disability: ironing, doing laundry, washing dishes, vacuuming, sweeping, taking out the trash, washing the car "with help or reminders," running errands, dealing with two teenagers in the house, feedings the pets, occasional painting, walking, occasionally helping her nephew, helping get her husband off to work and children off to school, occasionally going to breakfast or shopping, and watching television.

[4] The ALJ points to evidence in the record indicating that the plaintiff attempted to work part-time between May, 1998, and August, 2000.

[5] Specifically, the ALJ wrote:
> There is evidence in the record that the [plaintiff's] medications have helped. The [plaintiff] reported in December 2002 that her pain had improved modestly since her epidural steroid injection. . . . . The [plaintiff] stated at the hearing that she would relieve her pain by taking Tylenol everyday, that she would take from two to six Tylenol per day, and conceded that this would help at least a little . . . . She has also been recently prescribed Amitryptiline . . . . Though the [plaintiff] was receiving narcotic analgesics for a portion of the [plaintiff's] alleged period of disability, her current ability to obtain relief from over-the-counter medication tends to show the absence of intolerable, work-precluding pain.

[6] Specifically, the ALJ noted:
> There are inconsistencies in this record that tend to diminish the [plaintiff's] credibility. The [plaintiff] has complained of poor sleep to the Social Security Administration. . . . .

(continued...)

level of severity of symptoms reported by the plaintiff. The court finds that the ALJ's characterization of the record in this regard is erroneous. First, the kind of daily living activities reported by the plaintiff, consisting in large part of light household chores and other light, sporadic activities, are not inconsistent with a claim of disability. Second, the record is unclear as to whether the plaintiff was or was not in fact working part-time during any of the alleged period of disability. Nevertheless, any attempt that the plaintiff may have made to work part-time should not be used as a basis to undermine her reported severity of symptoms, as the record does clearly indicate that even while attempting to work, she suffered significantly from pain and that the work exacerbated her symptoms substantially. Third, the ALJ erred in discrediting the plaintiff's reported allegations of pain based on the fact that she may have enjoyed some limited relief by way of epidural and trigger point injections, and based on the fact that she "conceded" that Tylenol helps the pain at least "a little," during the administrative hearing.[7] Finally, the ALJ's

---

[6](…continued)

> [However,] the [plaintiff] told Dr. Justice in October 2002 that she had a good appetite and was sleeping well. These inconsistencies diminish the [plaintiff's] credibility as to her allegations of total disability.

[7] The exchange between the ALJ and the plaintiff in this regard took place, in relevant part, as follows:

> Q: (ALJ) Does sitting cause you any problems?
> A: (Plaintiff) Yes it does.
> Q: How?
> A: I have pain down my back, my hand and my left shoulder, right now.
> Q: Well when do you have pain down your back and your left shoulder?
> A: Almost all the time its there.
> Q: What do you do to relief [sic] it, if anything?
> A: I take Tylenol about every day. I sit down in my recliner and relax my neck. Once in a while a hot bath or shower.
>  . . .

(continued…)

characterization of the record as containing "inconsistencies" concerning the plaintiff's reported symptoms is misguided. Specifically, while the ALJ opined that "inconsistencies" undermined the severity of the plaintiff's reported symptoms, he offered only one example of such "inconsistencies," specifically that the plaintiff recorded problems with sleeping but then reported on one occasion that she was sleeping fine. This sole "inconsistenc[y]" is trivial and, more importantly, is somewhat irrelevant as it does not concern the symptom, specifically pain, which the plaintiff alleges precludes her from working. The court finds, therefore, that the ALJ inappropriately discounted the plaintiff's subjective allegations of pain.

## D. Opinion of Treating Physician

The plaintiff also argues that the ALJ erred in rejecting the opinion of one of the plaintiff's treating physician's, Dr. Harman. As set forth more fully above, Dr. Harman opined as to the plaintiff's reported symptoms and her credibility in a letter dated February 17, 2004.[8]

---

[7](…continued)
> Q: How many [Tylenol] would you say you take a day?
> A: Two to six.
> Q: Do they help?
> A: A little.
> Q: And when that little bit [of relief] occurs how long would it last?
> A: About an hour.

[8] Again, the letter described Dr. Harman's treatments for the plaintiff, as well as his opinion concerning her credibility as relates to her reported symptoms:
> [The plaintiff's] neck pain, shoulder pain, and upper extremity pain are consistent and sometimes coupled with headaches. [The plaintiff] has described that her symptoms are disabling and affect her sleep habits and physical activity.
> . . .
>
> Through my treatment of [the plaintiff], I find her complaints to be credible. I find this course of treatment consistent with

(continued…)

"A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted). The regulations require the ALJ to give reasons for giving weight to or rejecting the statements of a treating physician. See 20 C.F.R. § 404.1527(d)(2). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

The ALJ found that the "opinions and conclusions of Dr. Harman cannot be fully accepted." In rejecting Dr. Harman's opinion concerning the extent of the plaintiff's symptoms and her credibility in reporting those symptoms, the ALJ reasoned:

> The statement of [Dr. Harman] is conclusory, and is not consistent with the treating notes. For instance, the doctor described that the [plaintiff] had headaches in his summary statement, but this symptom is not mentioned in the treating notes.[9] Dr. Harman himself did not pronounce the [plaintiff] to be disabled , but he rather found her complaints to be credible. However, a doctor's endorsement of the [plaintiff's] symptoms and statements does not amount to a medical

[8] (...continued)
> a person who has encountered medical problems following an automobile accident in March 1998, neck surgery in September of 1999, and now residual pain from degenerative disk disease.

[9] The court notes that the ALJ's characterization of the evidence in this regard is erroneous. Specifically, on November 27, 2002, as set forth above, Dr. Harman noted that headaches were among the plaintiff's reported complaints. Further, the plaintiff's complaints, as reported to Dr. Harman on October 25, 2002, included pain that radiated upward toward her skull.

opinion of disability. Further, the statement does not reach the
most critical question, namely what effect her impairments
have on her vocational ability.

As the ALJ correctly identified, Dr. Harman's letter does not specifically say "I
find the plaintiff to be disabled," nor does it set forth his opinion as to the plaintiff's
specific residual functional capacity. Nevertheless, the court finds that the letter does rise
to the level of a treating physician's opinion "regarding [the] applicant's impairment." See
Singh, 222 F.3d at 452. Dr. Harman was clearly one of the plaintiff's treating physicians.
In his February 17, 2004 letter, he recounted the ongoing attempts he made to decrease the
plaintiff's pain, albeit for the most part unsuccessfully. He also opines that the plaintiff's
complaints of pain are credible, and that her course of treatment was consistent with
someone suffering from the same injuries and having undergone the same surgery as the
plaintiff. Dr. Harman's opinion should therefore have been accorded the appropriate
weight unless it was inconsistent with other substantial evidence in the record, which the
court finds is not the case. See Singh v. Apfel, 222 F.3d at 452. Accordingly, the ALJ
erred in not fully accepting Dr. Harman's opinion. Dr. Harman's opinion indicates that
the plaintiff's symptoms are both credible and disabling, and therefore, a remand for
further vocational expert testimony based on a specified RFC is unnecessary.

For the reasons discussed above, **IT IS RECOMMENDED**, unless any party files
objections[10] to the Report and Recommendation within ten (10) days of the date of the

---

[10]Any party who objects to this report and recommendation must serve and file
specific, written objections within ten (10) court days from this date. A party objecting
to the report and recommendation must arrange promptly for a transcription of all portions
of the record the district court judge will need to rule on the objections.

report and recommendation, that the decision of the ALJ be reversed and that this matter be remanded for an award of benefits.

February 13, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT